IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

NO. **23-13478**

United States of America,

Appellee,

- versus -

Jonathan Grenon and
Jordan Grenon,

Appellant.

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

_____

BRIEF FOR THE UNITED STATES

Markenzy Lapointe
United States Attorney
Attorney for Appellee
99 N.E. 4th Street
Miami, Florida 33132-2111
(305) 961-9383

Daniel Matzkin
Chief, Appellate Division

Jason Wu
Deputy Chief, Appellate Division

Jonathan D. Colan
Senior Appellate Attorney
Of Counsel

**United States v. Grenon et al., Case No. 23-13478**

**Certificate of Interested Persons**

In compliance with Fed. R. App. P. 26.1 and 11th Circuit Rules 26.1 and 28-1, the undersigned certifies that the list below is a complete list of the persons and entities previously included in the government's CIP, as well as additional persons and entities (designated in bold face) who have an interest in the outcome of this case.

Altonaga, Hon. Cecilia M.

Becerra, Hon. Jacqueline

Caruso, Michael

**Colan, Jonathan D.**

**Damian, Hon. Melissa**

Della Fera, Richard Francis

Donnelly, Paul Joseph

**Dopico, Hector A.**

**Gonzalez, Juan Antonio**

Grenon, Jonathan David

Grenon, Jordan Paul

Grenon, Joseph Timothy

**United States v. Grenon et al., Case No. 23-13478**
**Certificate of Interested Persons (Continued)**

Grenon, Mark Scott

**Fajardo Orshan, Ariana**

Homer, Michael B.

**J.M.**

**J.W**

Kay, Ashley Devon

Lapointe, Markenzy

Lopez, Bernardo

Louis, Hon. Lauren Fleischer

**Matzkin, Daniel**

**McAliley, Hon. Chris M.**

Otazo-Reyes, Hon. Alicia M.

Padilla, Joaquin E.

**P.M.**

**S.B.**

**R.B.**

**Silverstein, Joan**

Shipley, Jr., John Charlton

**United States v. Grenon et al., Case No. 23-13478**
**Certificate of Interested Persons (Continued)**

T.A.

Torres, Hon. Edwin G.

Vora-Puglisi, Sabrina D.

**Wu, Jason**

Wylie, IV, John William

/s/ Jonathan D. Colan
Jonathan D. Colan
Senior Appellate Attorney Attorney

**Statement Regarding Oral Argument**

The United States of America respectfully suggests that the briefs and record before this Court adequately present the facts and legal arguments and that oral argument would not significantly aid the decisional process.

# Table of Contents

**Page:**

Certificate of Interested Persons ........................................................ c-1

Statement Regarding Oral Argument .................................................. i

Table of Contents ............................................................................. ii

Table of Citations ............................................................................ iv

Statement of Jurisdiction ................................................................ xii

Introduction .................................................................................... 1

Statement of the Issues..................................................................... 1

Statement of the Case:

1.    Course of Proceedings and Disposition in the Court Below ...................... 2

2.    Statement of the Facts ............................................................. 4

    a.    Offense Conduct................................................................. 4

        Genesis created to market MMS ............................... 4

        FDA investigation.................................................. 7

        Victim impact ...................................................... 9

        Violation of court orders....................................... 10

    b.    District Court Proceedings ................................................ 13

3.    Standards of Review ............................................................... 21

Summary of the Argument ................................................................ 22

# Table of Contents

## (continued)

**Page:**

Argument

I.    The District Court Ensured Appellants Knowingly and Voluntarily Chose to Represent Themselves. ...............................................24

II.    Neither Appellants' Statutory nor Constitutional Speedy Trial Rights Were Violated. ..........................................................................31

III.    Appellants Proffered No Prima Facie Religious Defense to their Charges. ...............................................................................39

IV.    The District Court Did Not Plainly Err in Applying the Statutory Definitions of "Drug" and "New Drug." ....................................46

V.    Appellants Cannot Challenge the Underlying Injunctions in an Appeal from their Criminal Contempt Convictions. ..............................51

VI.    Appellants' Guideline Sentences Were Properly Supported by Unchallenged Evidence and Were Substantively Reasonable. ..................52

Conclusion  .......................................................................................60

Certificate of Compliance ....................................................................61

Certificate of Service  .........................................................................62

# Table of Citations

**Cases:**                                                                                **Page:**

*Barker v. Wingo*,

   407 U.S. 514 (1972)..............................................................................38

*Bey v. State*,

   847 F.3d 559 (7th Cir. 2017)...........................................................44

*Bonner v. City of Prichard*,

   661 F.2d 1206 (11th Cir. 1981)........................................................51

*Burwell v. Hobby Lobby Stores, Inc.*,

   573 U.S. 682 (2014) ..........................................................................42

*CBS Broad., Inc. v. EchoStar Commc'ns Corp.*,

   450 F.3d 505 (11th Cir. 2006)..........................................................52

*Chevron U. S. A. Inc. v. NRDC, Inc.*,

   467 U.S. 837 (1984) ..........................................................................49

*Does 1-11 v. Bd. of Regents of Univ. of Colorado*,

   100 F.4th 1251 (10th Cir. 2024) .......................................................43

*Faretta v. California*,

   422 U.S. 806 (1975) ......... 14, 16, 19. 20, 22, 24, 25, 28, 29, 30, 31, 32, 33, 34, 35

*Frontiero v. Richardson*,

   411 U.S. 677 (1973) ..........................................................................41

iv

## Table of Citations (Continued)

**Cases:**                                                                                                    **Page:**

*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*,

  546 U.S. 418 (2006) ...............................................................................43

*\*ITT Cmty. Dev. Corp. v. Barton*,

  569 F.2d 1351 (5th Cir. 1978)...............................................................51

*Johnson v. Bd. of Regents of Univ. of Georgia*,

  263 F.3d 1234 (11th Cir. 2001)..............................................................41

*Loper Bright Enterprises v. Raimondo*,

  144 S. Ct. 2244 (2024) ..................................................................... 49, 50

*United States v. Benabe*,

  654 F.3d 753 (7th Cir. 2011)..................................................................44

*United States v. Booker*,

  543 U.S. 220 (2005) ...............................................................................55

*United States v. Brown*,

  669 F.3d 10 (1st Cir. 2012) ....................................................................44

*United States v. Browning*,

  723 F.2d 1544 (11th Cir. 1984)..............................................................41

*United States v. Cenephat*,

  115 F.4th 1359 (11th Cir. 2024) ............................................................57

**Table of Citations (Continued)**

<u>**Cases**</u>:                                                                                          <u>**Page**</u>:

*United States v. Cobble*,

    2022 WL 3448354 (11th Cir. Aug. 12, 2022)........................................................30

*United States v. Corbett*,

    921 F.3d 1032 (11th Cir. 2019)..............................................................................22

*United States v. Dunn*,

    83 F.4th 1305 (11th Cir. 2023) ..............................................................................39

*United States v. Durdley*,

    2023 WL 7547591 (11th Cir. Nov. 14, 2023)........................................................30

*United States v. Focia*,

    856 F. App'x 830 (11th Cir. 2021) ........................................................................45

*United States v. Gallardo*,

    977 F.3d 1126 (11th Cir. 2020)..................................................................... 21, 52

*United States v. Garey*,

    540 F.3d 1253 (11th Cir. 2008)..............................................................................21

\**United States v. Grady*,

    18 F.4th 1275 (11th Cir. 2021) ..............................................................................40

*United States v. Graham*,

    --F.4th--, 2024 WL 4929254 (11th Cir. Dec. 4, 2024) ................................... 21, 50

**Table of Citations (Continued)**

**Cases:**                                                                                                    **Page:**

*United States v. Gross*,

   2024 WL 448368 (11th Cir. Feb. 6, 2024) ...........................................................30

\**United States v. Hakim*,

   30 F.4th 1310 (11th Cir. 2022) ..........................................................................24

*United States v. Hayes*,

   40 F.3d 362 (11th Cir. 1994)...............................................................................39

*United States v. Hesser*,

   800 F.3d 1310 (11th Cir. 2015)...........................................................................22

*United States v. Hill*,

   119 F.4th 862 (11th Cir. 2024) ..........................................................................51

*United States v. Jimenez*,

   756 F. App'x 933 (11th Cir. 2018) ....................................................................39

\**United States v. Keene*,

   470 F.3d 1347 (11th Cir. 2006)...........................................................................52

*United States v. Khoury*,

   901 F.2d 948 (11th Cir. 1990)............................................................................36

*United States v. Lopez*,

   649 F.3d 1222 (11th Cir. 2011)................................................................... 36, 37

**Table of Citations (Continued)**

<u>Cases</u>:                                                                        <u>Page</u>:

*United States v. Mateos*,

   623 F.3d 1350 (11th Cir. 2010)......................................................................59

*United States v. McCutcheon*,

   86 F.3d 187 (11th Cir. 1996)........................................................................38

*United States v. McElrath*,

   253 F. App'x 866 (11th Cir. 2007) ..............................................................54

*United States v. Murray*,

   154 F. App'x 740 (11th Cir. 2005) ..............................................................38

*United States v. Murry*,

   31 F.4th 1274 (10th Cir. 2022) ....................................................................45

\**United States v. Ogiekpolor*,

   122 F.4th 1296 (11th Cir. 2024) ....................................................... 21, 31, 39

*United States v. Quaintance*,

   608 F.3d 717 (10th Cir. 2010)......................................................................42

*United States v. Register*,

   182 F.3d 820 (11th Cir. 1999)......................................................................37

*United States v. Schlei*,

   122 F.3d 944 (11th Cir. 1997)................................................................ 32, 38

**Table of Citations (Continued)**

**Cases:**      **Page:**

*United States v. Stanley*,

    739 F.3d 633 (11th Cir. 2014)................................................................25

*United States v. Taylor*,

    21 F.4th 94 (3d Cir. 2021)....................................................................30

*United States v. Thomas*,

    32 F.4th 1073 (11th Cir. 2022) ....................................................... 53, 58

*United States v. Tobin*,

    840 F.2d 867 (11th Cir. 1988)................................................................36

*United States v. Vereen*,

    920 F.3d 1300 (11th Cir. 2019)..............................................................50

*United States v. Villarreal*,

    613 F.3d 1344 (11th Cir. 2010)..............................................................21

*United States v. Williams*,

    29 F.4th 1306 (11th Cir. 2022) ..............................................................30

*United States v. Williams*,

    314 F.3d 552 (11th Cir. 2002)................................................................32

*United States v. Willis*,

    649 F.3d 1248 (11th Cir. 2011)..............................................................54

**Table of Citations (Continued)**

<u>**Cases:**</u>                                                                         <u>**Page:**</u>

*United States v. Woodley*,

   484 F. App'x 310 (11th Cir. 2012) ........................................36

<u>**Statutes & Other Authorities:**</u>                                      <u>**Page:**</u>

18 U.S.C. § 371 ........................................................... 3, 53, 59

18 U.S.C. § 3161 ............................................................ 31, 32

18 U.S.C. § 3231 ............................................................... xii

18 U.S.C. § 3742 ............................................................ xii, 22

21 U.S.C. § 301 ....................................................................2

21 U.S.C. § 321 ...................................................... 46, 47, 48, 50

21 U.S.C. § 393 .................................................................50

28 U.S.C. § 1291 ............................................................... xii

11th Cir. R. 28-5 ............................................................1, 27

Fed. R. App. P. 4 ............................................................... xii

Fed. R. App. P. 26.1 ......................................................... c-1

Fed. R. App. P. 32 .............................................................61

Fed. R. Crim. P. 32.............................................................54

**Table of Citations (Continued)**

**United States Sentencing Guidelines:**                         **Page:**

USSG § 2B1.1 ..................................................................................53

USSG § 2X1.1 ..................................................................................53

**Regulations:**                                                 **Page:**

21 C.F.R. § 201.128 .........................................................................47

**Statement of Jurisdiction**

Codefendants Jonathan and Jordan Grenon appeal final judgments of the United States District Court for the Southern District of Florida in their criminal case, entered October 6, 2023 pursuant to 18 U.S.C. § 3231 (DE:219; DE:220). They filed a timely notices of appeal on October 20, 2023 (DE:222; DE:224); *see* Fed. R. App. P. 4(b). This Court has jurisdiction under 28 U.S.C. § 1291 and authority to examine their sentencing challenges under 18 U.S.C. § 3742(a).

xii

## Introduction

This case is about bleach sold as medicine. When a customer complained it "burns" and "tastes like bleach," Jordan Grenon replied, "[y]es that is the correct description of MMS" (DE:298:147-50[1]; GX51). But the Grenons had a plan. "If handled properly, a church can protect us," said co-conspirator Jim Humble (DE:298:108; GX14:3). So they called their operation a "church" as a get-out-of-laws-free card. They even acknowledged it was a ruse. "Come to us for healing and sanctuary from … government interference, and go to your church for your spiritual beliefs" (GX14:3).

This case is not about sincerely held religious beliefs. If the Grenons believed anything it was their immunity from United States law. No such immunity exists. There is no right to sell unapproved drugs or to evade lawful court orders.

## Statement of the Issues

I.     Whether the district court properly allowed Appellants to represent themselves.

II.    Whether Appellants' speedy trial rights were violated.

III.   Whether Appellants had any religious-based defense to their charged conduct.

---

[1] Pursuant to 11th Cir. R. 28-5, except where noted, page references in cited transcripts are to the numbers generated by the district court's electronic filing system.

**IV.** Whether the district court plainly erred in its instructions regarding the definitions of "drug" or "new drug."

**V.** Whether Appellants may challenge injunction orders entered in a previous civil proceeding in this appeal from their criminal contempt convictions.

**VI.** Whether Appellants' sentences were procedurally or substantively unreasonable.

**Statement of the Case**

**1.**    **Course of Proceedings and Disposition in the Court Below**

This case involves Jonathan and Jordan Grenon's fraud and contempt convictions, following trial where they represented themselves, regarding their distribution of "Miracle Mineral Solution" (which when mixed as directed was essentially bleach) that they marketed as a cure for diseases including cancer, Alzheimer's, diabetes, autism, Parkinson's, HIV/AIDS, and Covid (DE:16; DE:219; DE:220). Appellants distributed MMS along with their father Mark and their brother Joseph (DE:16:5-6).[2]

This criminal action followed the government's earlier efforts to enjoin the Grenons from violating the Food, Drug, and Cosmetic Act, 21 U.S.C. § 301 *et seq.*, which regulates the manufacture, labeling, and distribution of all drugs shipped or received in interstate commerce (DE:16:1-2).

---

[2] Mark did not appeal and Joseph's appeal was dismissed.

In 2020, the government filed a civil complaint in the Southern District of Florida seeking injunctive relief against the Grenons violating the FDCA (DE:16:6; *United States v. Genesis II Church of Health and Healing, et al.*, Case No. 20-21601-CV-WILLIAMS[3]). The court issued a temporary restraining order and later a preliminary injunction prohibiting the Grenons from "directly or indirectly, label[ing], hold[ing], and/or distribut[ing] any [unapproved or misbranded] drug, including but not limited to MMS" (DE:16:6; CV DE:4:3; CV DE:26:8).

Because the Grenons continued their activities, in April 2021 a federal grand jury in the Southern District of Florida charged them with: (Count 1) conspiracy to defraud by (i) impeding the FDA's function of ensuring "that drugs marketed and distributed to the American public were safe and effective for their intended uses"; (ii) marketing a drug that did not have required FDA approval; and (iii) marketing a misbranded drug, all in violation of 18 U.S.C. § 371; and criminal contempt by continuing to distribute MMS in violation of court orders (Counts 2 and 3) (DE:16).

The Grenons repeatedly waived counsel and represented themselves, with standby counsel appointed. They filed several motions to dismiss their indictment which were denied (DE:20; DE:24; DE:105; DE:111; DE:116; DE:117; DE:120; DE:121; DE:123; DE:264:10).

---

[3] Records from this civil action are cited as "CV DE:__."

3

The jury convicted Appellants on all counts, finding they committed all three objects of the fraud conspiracy (DE:186). They were sentenced to 151-month prison terms and three years' supervised release (DE:219; DE:220).

They filed timely notices of appeal (DE:222; DE:224) and remain incarcerated.

## 2.    <u>Statement of the Facts</u>

### a.    **Offense Conduct**

#### **Genesis created to market MMS**

"Genesis II Church of Health and Healing" was founded in 2010 by Mark Grenon and Jim Humble (DE:298:106). Genesis's website linked to Humble's statement explaining that, "while on a gold mining expedition in South America," he "discovered that chlorine dioxide quickly eradicates malaria" (DE:298:103-105; GX12). Chlorine dioxide is an industrial bleach (DE:298:83). Humble claimed it "restore[d] partial or full health to hundreds of thousands of people suffering from a wide range of disease, including cancer; diabetes; … multiple sclerosis; Parkinson's; Alzheimer's" and many others (DE:298:104-05; GX12).

Genesis distributed chlorine dioxide as "Miracle Mineral Solution"—comprised of liquid sodium chlorite and an acid activator, which together form the bleach compound (DE:298:82-84).[4] Despite using the word "church," Genesis

---

[4] Occasional transcript references to "sodium chloride" (NaCl) appear to be

4

existed as "an online organization made up of websites [and] videos of infomercials … that promoted" MMS (DE:298:84-85). At the time of the relevant charges, after Humble retired, Mark Grenon, and his sons Jonathan, Jordan, and Joseph identified themselves on Genesis's websites and videos as its principals (DE:298:85-86). Genesis's website claimed MMS could cure 95% of all diseases (DE:298:85-86, 97).

Yet, neither MMS nor chlorine dioxide was approved by the FDA for any use (DE:298:83). To get around that, Humble and the Grenons called Genesis a church (DE:298:87).

Co-founder Humble explained this "important concept" in Genesis promotional materials (DE:298:108; GX14). "[W]e are forming a church of health and healing. Now, that's not religion, that's health and healing" (*id.*). "Do you understand the power that a church has that hasn't given up its power? Look at the Catholics. Their priests have been molesting women and children for centuries and the governments have not been able to stop it. If handled properly, a church can protect us" (*id.*).

Mark explained, in a promotional interview of himself and Jonathan, that when he partnered with Humble he said, "I know you're gonna get attacked all the time, I'm a missionary … missions are pretty respected, they're known as helping people, … so, I said, why don't we start a mission, a church, because the word

---

mistranscriptions of "sodium chlorite" ($NaClO_2$).

'church' just means, in the Greek, a group of people with one purpose…. [R]eally it was a political body" (DE:298:109; GX15). Mark related how he told Humble, who did not share his religious beliefs, that they could "have atheists in our church" (*id.*). When asked why a "church," Mark responded, "because everything you do commercially is under the universal commercial code, okay, a church is completely separate from that, codes, statutes, and laws, that's why a priest can give a kid wine in church … and not get arrested, because it's a sacrament" (*id.*). The Grenons therefore listed their MMS products for sale as "sacraments" (GX18).

Genesis's website described it as "a nonreligious church welcoming people from all walks of life, religions, colors, creeds and belief systems." (DE:298:105; GX13). The "only prerequisite for becoming a member" was believing in "[d]oing good deeds," "[g]ood health for all mankind," "[d]oing what is right," "[f]reedom for all mankind," "[e]nlightening others with the truth," and "[h]elping one another" (*id.*)—that and "$35 per adult which includes the Membership card with a picture for the first year and $20 a year there after" (GX13).

But customers did not need to be members of the "church"; anyone could purchase MMS from Genesis's online store (DE:298:90, 113).

The Grenons posted numerous videos promoting MMS and describing dosing protocols for curing cancer, HIV, Covid, and other diseases (DE:298:90-101; GX3; GX6; GX7; GX8).

6

**FDA investigation**

The FDA became aware of adverse reactions from MMS (DE:298:83). It determined MMS met the statutory definition of a "drug" because both its label and labelling (which includes other marketing materials describing a product's use) indicated it was "intended for treatment, diagnosis, cure, prevention or mitigation of disease" (DE:299:15-16, 19). MMS's product labels, the Genesis website, and other promotional materials all claimed it cured, treated, mitigated or prevented diseases such as cancer and many others (DE:299:16-17). It was a "new drug" because it was "not one that's generally recognized as safe and effective for its intended uses by experts qualified by their training and experience to determine whether it's actually safe and effective for those intended uses" (DE:299:20). MMS had no clinical studies showing it was safe and effective for any of its proffered uses (DE:299:25). Neither MMS nor chlorine dioxide is approved by the FDA for any use or had an application for approval (DE:298:83; DE:299:28-30). Nor did MMS have directions sufficient to enable a layperson to use the drug safely for any of its proffered uses (DE:299:32-33). MMS was considered misbranded because it was marketed without approval and adequate directions and because it was not manufactured, prepared, or processed in a safe and clean registered establishment (DE:299:33-38).

In 2010, the FDA issued a public warning against its use, noting its harmful effects, including at least one "life threatening reaction" (DE:298:83; GX1).

7

FDA Criminal Investigations Special Agent Jose Rivera purchased MMS from Genesis's websites under the name Russell Henderson (DE:298:81-82, 110-14 GX22). Purchasing a 4-ounce bottle of the "sacrament" required a $15 "donation" (DE:298:112-13; GX18). Customers could not decide for themselves the amount of one's "donation" (*id.*). Purchased in bulk, a 40-bottle kit cost $900 (DE:298:116). A Genesis email reflecting an MMS transaction ended: "Congratulations on the sale" (DE:298:136; GX44).

Rivera's order shipped from Jonathan home address on October 3, 2019 (DE:298:117; GX23). He received MMS, the acid activator that turns it into chlorine dioxide, and a bottle of calcium hypochlorite (otherwise known as "pool shock," "often used for cleaning out swimming pools" when they turn green) (DE:298:96, 118; GX24; GX25; GX26A). These were to be ingested (DE:298:96).

The contact card in the package listed Genesis, its websites, and Jonathan's and Jordan's email addresses (DE:298:118-19; GX27). An enclosed pamphlet described their "most common sacramental kit" (DE:298:121; GX 28B):

> MMS is the mineral sodium chlorite that needs to be activated to become chlorine dioxide.
>
> HCL is hydrochloric acid (stomach acid) that we use to activate MMS.
>
> DMSO is a solvent made from trees during the process of making paper. It naturally has anti-inflammatory properties and is used to help bring MMS1 deeper into the body.

(*id.*).

8

After receiving his order, Agent Rivera (as Henderson) emailed one of the provided addresses that his wife "started taking it to cure her cancer [but] we haven't seen any improvement" (DE:298:126-27; GX34). He asked "[s]hould she continue with the dosage or increase?" (*id.*). Jordan responded "[t]ests can be unreliable" and "[t]hree weeks is not long enough for more serious diseases like cancer" (DE:298:128; GX35). He recommended increasing her dosage (DE:298:129; GX37).

Rivera placed and received a second order shipped from Jonathan's home on March 18, 2020 (DE:298:129-31; GX38). It, too, contained contact information including Jonathan's and Jordan's email addresses (DE:298:132; GX43).

Google records obtained for the email address G2sacraments@gmail.com, listed in the contact card and to which Jordan responded, indicated that "tens of thousands" of MMS orders had been placed from all across the United States earning the Grenons "[o]ver 1 million" dollars. (DE:298:133-34). All shipments were made from Jonathan's address (DE:298:134).

**Victim impact**

Many customers complained of sickness and hospitalization (DE:298:135). The Grenons called them liars (DE:298:135).

A customer emailed Jordan: "[M]y husband had a very bad adverse reaction which landed him in the hospital DUE TO SEVERE LOW BLOOD PRESSURE

which occurred within 15 minutes after taking" MMS (DE:298:137-40; GX45). Jonathan emailed Jordan: "Liars. Do not believe them. And will not take it back to return any money…." (DE:298:141; GX45).

Another customer wrote, saying when she "felt [the product] hit my stomach … I started throwing up and pooping at one time" (DE:298:142-143; GX47). Her friend found her unconscious and then "screaming and shaking" (*id.*). "The doctor said if [her friend] hadn't come and gotten me to the hospital, then I would have died" (*id.*). Mark told Jordan: "She obviously didn't listen" (*id.*).

When another customer emailed Jordan, saying a friend taking MMS for diabetes had his blood pressure "increase[] dangerously," adding "I am scared. Should we continue?", Jordan replied, "Sometimes when cleansing, the body goes through changes so things can go up and down, but if you do it slow and steady, the person should feel comfortable healing" (DE:298:146; GX49).

To another customer complaining "the back of my throat burns from the drinking the drops with water" and asking whether it "sound[s] like the mixture is correct? Dark yellow/amber color, stinks and tastes like bleach?," Jordan replied, "[y]es that is the correct description of MMS" (DE:298:147-50; GX51).

### Violation of court orders

Because of the life-threatening reactions to MMS, the FDA sought and received a temporary restraining order and then a preliminary injunction against the

Grenons, enjoining them from "directly or indirectly, label[ing], hold[ing], and/or distribut[ing] any [unapproved or misbranded] drug, including but not limited to MMS" (DE:298:152-58; GX53; GX54).

The Grenons were served copies of both the temporary restraining order and the preliminary injunction (DE:298:156-58). They complied with neither (DE:298:158, 166).

Mark wrote the court: "We are practicing civil disobedience against this unjust order" (DE:298:159; GX55), adding:

> Civil disobedience is permitted in the U.S. Constitution peaceably, of course, at first, if possible....
>
> NOTE: The Second Amendment is there in case it can't be done peaceably.

(*id.*). All four Grenons wrote: "STOP Harassing us immediately" (DE:298:161-62; GX56).

On June 20, 2020, Jordan posted a video of Jonathan explaining how to obtain MMS despite the court orders (DE:298:167-70; GX59; GX60). Agent Rivera was again able to order and receive MMS (DE:298:170-71). It shipped on July 6, 2020, from Jonathan's address (DE:298:171-72; GX62).

In a video posted July 3, 2020, Jonathan bragged about distributing over 100 bottles of MMS in the previous two weeks (DE:298:173; GX63).

11

Jonathan and Jordan were arrested on July 8, 2020 (DE:298:174). A search of Jonathan's residence recovered approximately $40,000 in cash, MMS promotional materials, blue metal drums of sodium chlorite, and prepackaged bottes of MMS and activator (DE:298:175-80). Apart from the shed used as their manufacturing facility, there were additional drums of chemicals in other, smaller backyard sheds (DE:298:180-83). The blue drums' labels indicated they contained: "Sodium chlorite 80 percent powder. Used for industry. Net weight: 50 kilograms" (DE:298:183). There were 85 such drums (4,250 kilograms) (DE:298:183).

A label warned:

> May cause fire or explosion. Strong oxidizer. Harmful if swallowed. Cause serious eye damage. May cause damage to organs through prolonged or repeated exposure. Very toxic to aquatic life. Supplementary information: Contact with acids cause exothermic reaction and explosion.

(DE:298:184-85; GX66C). The label additionally warned against "mixing with combustibles or acids" or "eat[ing], drink[ing] or smok[ing] when using this product," and advised: "If swallowed, call a poison center" (*id.*).

Officials found the materials to prepare the MMS kits as well as already-prepared kits and shipping materials (DE:298:186-88). This facility—used to prepare and ship the Grenons' cure for cancer—had animal feces on the floor (DE:298:189; GX66M).

12

### b.    District Court Proceedings

A criminal complaint was filed against the Grenons on June 30, 2020 (DE:3).

Jordan and Jonathan were arrested in the Middle District of Florida on July 8, 2020 (DE:8:3). A magistrate judge "concluded they both knowingly and voluntarily waived their rights to counsel" and permitted them to represent themselves at their initial proceedings (DE:8:99). On July 13, 2020, the Middle District transferred them to the Southern District of Florida (DE:8:2). They made their initial appearance on September 4, 2020 (DE:10; DE:276).

Mark and Joseph were arrested in Colombia on request by the United States, and extradition efforts began (DE:41:5).

The grand jury indicted the Grenons on April 22, 2021 (DE:16).

Jordan and Jonathan were arraigned on April 26, 2021 (DE:19; DE:277). Jonathan opened: "I'm sui juris of one's own rights. I do not wish or agree to seek or be forced counsel that I do not choose" (DE:277:2).[5] The magistrate judge questioned him to ensure he was competent to proceed (DE:277:3-4). Jonathan assured the judge: "I am of sound mind and body, having good mental faculties." (DE:277:3).

The following day, the Grenons moved to dismiss their indictment, arguing among other things: that their "Unalienable rights given by God and preexisting

---

[5] Page references in DE:277 are those assigned by the court reporter.

government and our Civil rights (act of 1964) were violated by actors/agents of De Facto Government foreign to *us* as State Nationals"; that "No negotiation of Contract was offered"; that "we are unaware that Corporate By-laws do even apply to God fearing sons, (Mankind) not residing in a Foreign Federal District inhabiting our body's on Florida and Columbia serving Christ YAHWE our Savior"; and that "Our Religious freedoms have been violated … [a]ll do to Policies of the FDA unlawfully issued by someone … (*Not* Appointed or *Not* elected)" (DE:20).

The district court denied their motion and, "given the bizarre contents," directed the government to "indicat[e] whether it will be seeking psychiatric or psychological examinations" (DE:24). The government responded that it did not have sufficient basis to conclude the Grenons were incompetent (DE:30).

The district court appointed stand-by counsel to assist Jonathan and Jordan (DE:27; DE:29). After subsequent *Faretta*[6] hearings (DE:302; DE:320), though finding neither had "the skill or training to represent himself," the court granted their requests to represent themselves as " knowing and voluntary," while continuing its order appointing standby counsel (DE:34; DE:35).

The district court set trial for a September 2021 calendar (DE:40), but granted the government's motion to reset the trial for March 2022 to allow for Mark's and Joseph's extradition, over Jonathan's and Jordan's objections (DE:41; DE:290:9).

---

[6] *Faretta v. California*, 422 U.S. 806 (1975).

Jordan asserted the delay violated his due process rights and repeated the arguments in the dismissal motion (DE:290:6-8). When the district court addressed standby counsel, Jonathan objected, saying they "do not wish or agree to seek or be forced counsel that we do not choose," describing counsel as "foreign agents," and asking them to "leave the courtroom immediately" (DE:290:8-9).

The court found "the Government has established good cause for the requested continuance in order to achieve a joint trial with all Codefendants [and] that the ends of justice served by taking this action outweigh the best interest of the public and the Defendants in a speedy trial" (DE:290:9). It ordered that "the period of delay resulting from this continuance — i.e., from the date the Motion was filed, July 6, 2021, to the date trial commences — is excludable time under the Speedy Trial Act" (DE:44:2).

Colombia extradited Joseph in December 2021, and he made his initial appearance on December 23, 2021 (DE:47). At a January 2022 status conference, the government explained the status of Mark's extradition and asked for an additional six-month continuance, citing the interests of trying all co-conspirators together (DE64:5-7). Jonathan objected, repeating the arguments raised at the previous hearing (DE:64:8-15). When the court addressed standby counsel, Jonathan interrupted, "he is not my counsel" (DE:64:15). Jordan argued similarly (DE:64:15-24).

15

Before allowing Joseph to address the continuance, the district court held a *Faretta* inquiry to confirm that he knowingly and voluntarily waived representation, and it appointed standby counsel (DE:64:26-32). Joseph then echoed his brothers' arguments against the trial delay and the proceedings in general (DE:64:32-36).

Citing the government's arguments for trying co-conspirators together, the district court found that "[a] single trial of all four Defendants, the three Grenon brothers here today and the father who's resisting extradition, will serve all of those interests" and that the "ends of justice outweigh the best interests of these Defendants in a speedy trial" (DE:64:39).

Jonathan, Jordan, and Mark (from Colombia) then filed identical pleadings questioning the court's jurisdiction (DE:65; DE:68; DE:69).

After extradition, Mark made his initial appearance on July 28, 2022, and refused counsel (DE:75). The district court confirmed his choice after a subsequent *Faretta* hearing (DE:293:5-12).[7]

At an August 4, 2022 hearing, the government and standby defense counsel announced their readiness to proceed with the then-scheduled September 2022 trial date (DE:293:14-17). When Mark and Jonathan raised various sovereign-citizen-like arguments against the proceedings (DE:293:17-20), the district court advised them "strongly not to represent yourself" (DE:293:20-22).

---

[7] Page references in DE:293 are those assigned by the court reporter.

16

The district court then sua sponte ordered competency evaluations for each defendant (DE:85). It granted the government's subsequent motion (DE:88) to continue the trial date so that the competency evaluations could be completed, making ends-of-justice findings and excluding "the period of delay resulting from this continuance" (DE:89:1).

At this point, on August 18, 2022, Jonathan (DE:91) and Jordan (DE:92) moved for the appointment of counsel. At subsequent hearings,[8] Jordan accepted Attorney John Wylie as his lawyer (DE:317:5-9), but Jonathan refused to answer questions about his eligibility for appointed counsel (DE:318:21-22). The magistrate judge gave Jonathan 30 days to either confirm his eligibility or find his own lawyer (*id.*)

Jonathan and Jordan then moved to dismiss their indictments arguing violations of their speedy trial rights and prosecutorial misconduct in delaying their trial (DE:105; DE:111). The government noted it was the court that had ordered the competency evaluations and that "zero non-excludable days have elapsed pursuant to the Speedy Trial Act" (DE:110:2).

The district court denied Jordan's motion because he was represented by counsel and his pro se motion was therefore improper (DE:116). The court denied Jonathan's motion, noting that the Chief Judge's administrative orders suspending

---

[8] Page references in DE:317 and DE:318 are those assigned by the court reporter.

trials during Covid quarantine and the orders in this case "result in zero nonexcludable Speedy Trial days elapsing" (DE:117). It subsequently denied their reconsideration motions (DE:120; DE:121; DE:123).

At a September 2022 hearing, Jonathan requested another "60 to 90 days" to find a lawyer (DE:278:4). He again declined appointed counsel and "prefer[red] … you gave me 60, 90 days" (DE:278:4-5). The magistrate judge explained that appointing counsel right away would allow that lawyer to be ready for the then January 2023 scheduled trial date, whereas allowing more time to seek his own lawyer would result in further delays (DE:278:8-9). Jonathan refused appointed counsel (DE:278:9-10).

The competency evaluation results were filed under seal in October 2022 (DE:126; DE:135). The court subsequently found on the record that Jonathan and Jordan were competent (DE:286:8-9).

At a November 2022 status hearing, Jonathan asked for another 60 to 90 days and the court warned this would cause further delays (DE:264:5). The court denied Jonathan's motion to dismiss on speedy trial grounds, finding that "this case is being delayed in large part by [Jonathan's] request for indefinite amount of time … to hire an attorney" (DE:264:10).

Jordan then also objected to his appointed lawyer's participation at the hearing and asked too for "60 to 90 days … to seek effective counsel" (DE:264:11). Jordan

18

asserted that Mr. Wylie "will not defend my God-given rights" by filing certain motions Jordan had offered (DE:264:12). The court defended Mr. Wylie's representation, explaining, "When he tells you he cannot file a motion that you're requesting that he file, I trust he's using his legal expertise and judgment …" (DE:264:12). The court warned Jordan that she would not discharge Mr. Wylie, and that Jordan could, "like your brother, keep searching" for an attorney, but he would otherwise have to represent himself, because he had "already had two attorneys appointed" (DE:264:13). Jordan again asked "for 60 to 90 days" (DE:264:13).

The court found "that all of these delays to the scheduling of the trial are being caused by [Jonathan and Jordan]" and continued the trial date until July 2023 (DE:264:15). Standby and appointed defense counsel had no objections to the court's actions (DE:264:15). The court's order found that "Jonathan and Jordan Grenon will not be ready to proceed to trial as presently scheduled," "the interests of justice are served by a continuance of the trial, which outweighs any interest of the public or the Defendants in a speedy trial," and "the period of delay resulting from this continuance … is excludable time under the Speedy Trial Act" (DE:139:1-2).

At Jordan's request, Mr. Wylie moved to withdraw and again be appointed standby counsel (DE:144). After holding an additional *Faretta* inquiry (DE:319:5-

19

10[9])—Jordan's fourth (DE:319:5)—the court granted the motion and re-appointed Wylie as standby counsel (DE:147; DE:319:10). The court again warned Jordan that his request was "unwise" and "strongly urge[d]" him not to represent himself (DE:319:10).

Joseph and Mark refused counsel, again, at a January 2023 status hearing and again resisted the legitimacy of the proceedings (DE:286:10). At a June 1, 2023 status hearing, Mark refused to answer whether he wanted counsel and all Grenons refused to recognize the proceedings (DE:288:5-12). Yet again at a June 27, 2023 status hearing, Mark refused counsel and all Grenons continued to refuse to recognize the proceedings or even to accept the government's distributed proposed jury instruction regarding the lack of any religious defense in this case (DE:292:4-9).

On the eve of trial, the district court attempted another *Faretta* inquiry (DE:294:4). The court explained to the Grenons "how necessary a lawyer is and how he or she could help you," "the serious nature of the charges against you," and "the maximum sentences that you face if you are convicted," and the court questioned them about their ability knowledge of law and procedure—all to no avail (DE:294:8-10). They refused to answer or raise any objection to standby counsel (*id.*).

---

[9] Page references in DE:319 are those assigned by the court reporter.

Jonathan and Jordan were found guilty on all charges, including all charged objects of the Count 1 conspiracy (DE:186). Counts 2 and 3 had been dismissed against Mark and Joseph pursuant to the terms of their extradition (DE:169; DE:170).

### 3.    <u>Standards of Review</u>

Whether a defendant's decision to represent himself was knowing and voluntary is "a mixed question of law and fact which this Court reviews de novo." *United States v. Garey*, 540 F.3d 1253, 1268 (11th Cir. 2008).

This Court reviews "for clear error [the district court's] factual determinations as to excludable time" and its "ends-of-justice continuance[s] … for an abuse of discretion." *United States v. Ogiekpolor*, 122 F.4th 1296, 1304 (11th Cir. 2024).

A Constitutional speedy trial claim "presents a mixed question of law and fact" with "the district court's legal conclusions [reviewed] de novo, and … its factual findings for clear error." *United States v. Villarreal*, 613 F.3d 1344, 1349 (11th Cir. 2010) (cleaned up).

When a defendant fails to present to the district court a particular ground for a new trial, such a claimed error on appeal is reviewed only for plain error. *United States v. Gallardo*, 977 F.3d 1126, 1142 n.12 (11th Cir. 2020).

Unchallenged jury instructions are reviewed for plain error. *United States v. Graham*, --F.4th--, 2024 WL 4929254, at *35 (11th Cir. Dec. 4, 2024).

In reviewing sentences, this Court "shall accept the findings of fact of the district court unless they are clearly erroneous [and] give due deference to the district court's application of the guidelines to the facts." 18 U.S.C. § 3742(e); *United States v. Hesser*, 800 F.3d 1310, 1330 (11th Cir. 2015). This Court "review[s] unpreserved sentencing objections only for plain error." *United States v. Corbett*, 921 F.3d 1032, 1037 (11th Cir. 2019).

## Summary of the Argument

The entire record supports the district court's acquiescence to Appellants' choice to represent themselves. It did all it could to dissuade them. But over the long course of proceedings, Appellants demonstrated their ability to present their own arguments, however ill-conceived.

Neither their Speedy Trial Act nor Constitutional rights were violated by trial delays caused by Covid, awaiting extradition of all co-conspirators, and their own conduct requiring competency evaluations and multiple *Faretta* hearings. They even repeatedly asked for long delays themselves. The district court did not clearly err in its ends-of-justice findings or abuse its broad discretion to continue trial. Nor did any of the *Barker v. Wingo* Constitutional factors weigh against the government, and Appellants have shown no prejudice.

Appellants made no Religious Freedom Restoration Act or Free Exercise Clause claims that would cover their conduct. They never claimed MMS was a

spiritual cure or obligation, only a medical cure. The conspirators' own statements showed they called Genesis a "church" and MMS a "sacrament" only to evade legal requirements. At best, they made the mistaken sovereign citizen-based claim that they were religiously unbound by the entire United States government. The district court properly instructed the jury that they presented no religious defense to the charges, and any procedural error in how it made that determination was not plainly erroneous.

Appellants' new argument on appeal challenging the court's definition of "drug" and "new drug" cannot survive plain error review, and any error was invited by their acceptance of the court's instructions. The court's instructions for how to determine MMS's intended use were consistent with both undisputed evidence and the relevant statutes' plain meaning. No deference to agency interpretation was needed.

Appellants cannot now challenge the validity of the orders enjoining them from marketing MMS. They could have appealed those orders. But they cannot violate them and then contest their validity as a defense to criminal contempt charges. Regardless, they are wrong that they were entitled to jury trials before the court could enjoin their conduct.

Appellants' sentences were procedurally and substantively reasonable. The district court's *Keene* finding obviates any need to review the guideline

enhancements. Nevertheless, trial evidence and unobjected-to Presentence Investigation Report statements established the numerous disease patients Appellants victimized and the financial scope of their crimes. Their heinous conduct justified their sentences.

## Argument

## I.    The District Court Ensured Appellants Knowingly and Voluntarily Chose to Represent Themselves.

"'[F]orcing a lawyer upon an unwilling defendant is contrary to his basic right to defend himself if he truly wants to do so.'" *United States v. Hakim*, 30 F.4th 1310, 1321 (11th Cir. 2022) (quoting *Faretta*, 422 U.S. at 817).

The district court ensured Appellants were competent (DE:126; DE:135; DE:286:8-9) and held multiple *Faretta* hearings, explaining how they would benefit from representation and exploring whether they were knowingly and voluntarily waiving their right to counsel. *See Hakim*, 30 F.4th at 1322 (discussing factors to be explored before allowing self-representation). When they changed their minds, mid-course, and asked for counsel, the court gave them extended opportunities to find their own lawyers, before they insisted on representing themselves again. That their actions were prompted by their mistaken sovereign citizen beliefs did not strip them of their right to make the unwise decision to proceed pro se.

There is no error where "the record establishes … the defendant[s] understood the risks of self-representation and freely chose to face them." *United States v. Stanley*, 739 F.3d 633, 645 (11th Cir. 2014).

The Middle District magistrate judge first overseeing their case "concluded they both knowingly and voluntarily waived their rights to counsel" there (DE:8:99). Then, when they refused to participate in the proceedings here, the Southern District magistrate judge appointed standby counsel to assist them before their *Faretta* hearings (DE:27; DE:29).

After both Appellants refused counsel in Miami (DE:10; DE:277:2), the district court held its first *Faretta* hearings (DE:302; DE:320). Appellants were advised of the charges and penalties (DE:302:4-5; DE:320:8-9). They answered some of the questions about their age, education, background, and experience with the law, and desire to represent themselves, but refused to answer other questions about their capabilities and understanding of legal procedure (DE:302:5-13; DE:320:5-17).

Both Appellants were clear, however—when asked if they wanted counsel, both answered "I refuse" (DE:302:7; DE:320:10-11). Jordan explained: "I do not wish or agree to seek or be forced counsel I do not choose" (DE:320:9). Jonathan repeated three times: "I do not wish or agree to seek to be forced counsel that I do not choose" (DE:302:12).

25

Notably, after refusing to answer other questions, both acknowledged understanding the court's warning that they would be "on your own" and not helped by the court if they represented themselves (DE:302:8; DE:320:11). The court warned both about the risks and advised "you would be far better defended … by a trained lawyer than you can [defend] yourself" and "strongly urge[d]" them to accept counsel (DE:302:13; DE:320:17). Jonathan "refuse[d]" the court's advice and affirmed it was his voluntary decision to represent himself (DE:302:13-14). Jordan likewise insisted, "I will represent myself," and affirmed his decision was voluntary (DE:320:17-18).

The district court heard their answers and observed their demeanor before finding they had "knowingly and voluntarily" waived counsel (DE:302:14; DE:320:18). Clear-eyed about the Appellants, the court found that though neither had "the skill or training to represent" themselves, their decisions were "knowing and voluntary," and it granted their requests to represent themselves, while continuing the appointment of standby counsel (DE:34; DE:35).

Because of their continued behavior, however, the court ordered competency evaluations, and both Appellants were found competent (DE:126; DE:135; DE:286:8-9). Throughout the proceedings, the Grenons repeatedly offered sovereign-citizen-type objections to the proceedings (*e.g.* DE:64:13-15; DE:264:11, 17-20; DE:286:6-7; DE:290:6-8; DE:292:5; DE:293:20-22; DE:294:5). At one

hearing, the court told Jonathan and Mark that their arguments were "nonsensical" and advised them "you don't know the law, which is why I advise you strongly not to represent yourself" (DE:293:20-22). Nevertheless, their arguments showed they understood the jeopardy they faced and demonstrated their ability to present their views, however mistaken.

Appellants then changed their minds and requested counsel (DE:91; DE:92). At the August 24, 2022 hearings on those requests, Jordan cited a "communication breakdown" with his previously-appointed standby counsel (DE:317:5). [10] The magistrate judge appointed Attorney John Wylie as Jordan's new counsel but warned Jordan that the case had already been delayed and was then scheduled for trial four months later in January (DE:317:5-9).

Jonathan refused to answer the magistrate judge's questions regarding his qualification for or agreement to having his standby public defender assume his representation (DE:318:21). [11] The judge had standby counsel remain and gave Jonathan 30 days to either retain his own lawyer or provide sufficient information allowing appointment of counsel (DE:318:21-22).

---

[10] Pursuant to 11th Cir. R. 28-5, this transcript is cited according to the page numbers assigned by the court reporter.

[11] Pursuant to 11th Cir. R. 28-5, this transcript is cited according to the page numbers assigned by the court reporter.

A month later, in September 2022, Jonathan reported that he would "need 30 to 60 days to accomplish obtaining counsel" (DE:278:3). The magistrate judge again offered to appoint counsel, but Jonathan "prefer[red] that … you gave me 60, 90 days" (DE:278:5). The judge warned Jonathan that any new attorney would have difficulty preparing for the then-scheduled January trial date and again offered to appoint a lawyer right then (DE:278:8-9). Jonathan refused (DE:278:9-10).

At the next hearing in November 2022, Jonathan was still "in the process of trying to acquire effective counsel" (DE:264:4-5). Though the court warned he was causing further delays, Jonathan asked "to be released for 60 to 90 days to exhaust my administrative remedies" (DE:264:5).

Jordan asked to be heard and said he now refused to be represented by Mr. Wylie, because he would not press Jordan's proffered arguments (DE:264:11). The court warned Jordan that if he refused Mr. Wylie "you're going to be back to representing yourself, [because you've] already had two attorneys appointed" (DE:264:13).

Jordan directed Mr. Wylie to move to withdraw (DE:144; DE:319:3). And so the court held another *Faretta* hearing, informing Jordan that he had a right to an attorney and could have one appointed (DE:319:5). When asked, "Shall I appoint a lawyer to represent you," Jordan replied, "I do not consent to another speaking for me" (DE:319:6). The court again explained the advantages of having a lawyer and

28

asked if Jordan understood the risks of representing himself, and the government again explained the charges and penalties, but when asked if he understood Jordan kept replying, "I do not consent to these proceedings" (DE:319:6-7). He replied the same when asked about his drug use, mental illness, and other questions regarding his capabilities or desire for an attorney (DE:319:7-10). After the court advised Jordan why he'd be "better defended by a trained lawyer" and "strongly urge[d]" him not to represent himself, Jordan insisted he did "not consent to … another speaking for me" (DE:319:10). The court granted Jordan's request and had Mr. Wylie remain as standby counsel (DE:319:10-11; DE:147).

Even on the eve of trial, the district court attempted to hold yet another *Faretta* inquiry to ensure the Grenons wished to represent themselves and clarify if they would accept standby counsel assistance (DE:294:7-8). Despite their refusal to respond, the court again asked the standard *Faretta* inquiry questions (DE:294:8-11).

Throughout all these hearings, Appellants demonstrated their understanding that they were being prosecuted and faced continued incarceration for their conduct. They repeatedly argued their objections to that fact, seeking dismissal on various legal grounds and challenging the length of their detention. That they espoused sovereign citizen beliefs about their predicament did not render them incompetent or incapable of waiving their right to counsel.

Maintaining false beliefs does not rise to a level of mental incompetence that prevents a defendant from making his own choices. *See United States v. Durdley*, 2023 WL 7547591, at *2 (11th Cir. Nov. 14, 2023) (unpublished) ("expressing [sovereign citizen] views doesn't necessarily indicate irrationality of the sort that a court would find calls a party's competence into question").

"Courts have repeatedly concluded that 'sovereign citizens' may represent themselves despite their frivolous beliefs about the law." *United States v. Taylor*, 21 F.4th 94, 102 (3d Cir. 2021) (collecting cases). This Court has acknowledged decisions from other circuits affirming the right of so-called sovereign citizens to represent themselves. *See United States v. Williams*, 29 F.4th 1306, 1314 n.6 (11th Cir. 2022). Indeed, the Third Circuit vacated a conviction where the district court denied a defendant's right to represent himself as a result of his "frivolous beliefs." *See Taylor*, 21 F.4th at 102.

The district court here properly and repeatedly assessed Appellants' understanding, capabilities, and wishes, and no error has been shown. *See United States v. Gross*, 2024 WL 448368, at *9-12 (11th Cir. Feb. 6, 2024) (unpublished) (affirming *Faretta* finding despite defendant's "incoherent and frivolous" arguments); *United States v. Cobble*, 2022 WL 3448354, at *7-12 (11th Cir. Aug. 12, 2022) (unpublished) (affirming validity of sovereign citizen's counsel waiver).

"[A]lthough [a defendant] may conduct his own defense ultimately to his own detriment, his choice must be honored …." *Faretta*, 422 U.S. at 834.

## II.    Neither Appellants' Statutory nor Constitutional Speedy Trial Rights Were Violated.

Appellants' statutory and Constitutional speedy trial rights were satisfied because all the delays resulted from their own conduct, their co-conspirators' resistance to extradition, and the Covid-era suspension of jury trials. The district's Chief Judge excluded all time up to September 6, 2021 due to Covid closures, and the last co-defendant did not make his first appearance until July 28, 2022, thus beginning the Speedy Trial Act clock. The remaining time was covered by the district court's ends-of-justice continuances up to the final July 3, 2023 calendar, prompted by *Faretta* hearings, competency evaluations, and Appellants' own multiple requests for additional time while they shifted back-and-forth over whether they wanted counsel. Trial began on July 17, 2023. The district court did not clearly err in its findings and acted within its "broad discretion" to grant such continuances. *See Ogiekpolor*, 122 F.4th at 1313. Given their own conduct and lack of any prejudice, neither their statutory nor Constitutional rights were violated.

A defendant's trial must begin within 70 days from the later of his indictment or his arraignment on that indictment. 18 U.S.C. § 3161(c)(1). "In a case involving multiple defendants, the seventy-day time limit begins to run when the last

codefendant is indicted or arraigned." *United States v. Schlei*, 122 F.3d 944, 985 (11th Cir. 1997).

But the Speedy Trial Act provides that certain periods are excluded from that 70-day limit, such as periods to resolve pretrial motions, secure appearance of absent codefendants, conduct competency evaluations, or other periods covered by ends-of-justice continuance findings. *See* 18 U.S.C. § 3161(h); *United States v. Williams*, 314 F.3d 552, 556 (11th Cir. 2002).

Prior to and during the pendency of the Grenons' case, the district's Chief Judge issued administrative orders suspending all jury trials during the Covid pandemic—from March 30, 2020, through September 6, 2021—finding the ends of justice outweighed the interests of the parties and public in a speedy trial due to the severe health risks. *See Administrative Orders* 2020-18, 2020-21, 2020-24, 2020-33, 2020-41, 2020-53, 2021-65, *In Re: Coronavirus Public Emergency.*

The Speedy Trial Act clock commenced on July 28, 2022, when Mark appeared in the Southern District (DE:75).

The following timeline shows the Act's 70-day limit never lapsed:

| | | |
|---|---|---|
| 6/30/20 | Criminal complaint filed (DE:3) | |
| 7/8/20 | Jonathan and Jordan arrested in MDFL (DE:8:3) | |
| 9/4/20 | Jonathan's and Jordan's initial appearance in SDFL, refusing counsel and requiring *Faretta* hearings (DE:9; DE:10) | |

32

| | | |
|---|---|---|
| 4/22/21 | Indictment (DE:16) | |
| 4/27/21 | Jonathan's and Jordan's dismissal motion (DE:20) | |
| 4/28/21 | Order denying dismissal (DE:24) | |
| 4/30/21 | Order setting *Faretta* hearings (DE:27; DE:29) | |
| 5/3/21 | Jonathan's and Jordan's *Faretta* hearings (DE:302; DE:320) | |
| 6/7/21 | Order setting 9/27/21 trial calendar (DE:40) | |
| 7/13/21 | Hearing on government motion to continue trial to await Mark's and Joseph's extradition (DE:290). | |
| 7/14/21 | Order granting "interests of justice" continuance, excluding days up to new 3/14/22 trial calendar (DE:44) | **District Court's Ends-of-Justice Exclusion Through 3/14/22**<br><br>**Chief Judge's Covid Order Ends 9/21/21** |
| 12/23/21 | Joseph's initial appearance, refusing counsel and requiring *Faretta* hearing (DE:47) | |
| 12/29/21 | Joseph's *Faretta* hearing (DE:48) | |
| 1/5/22 | Status conference (DE:64:39) and order (DE:56) granting "ends of justice" continuance, excluding days up to new 9/12/22 trial calendar | **District Court's Ends-of-Justice Exclusion Through 9/12/22 Speedy Trial Act** |

| | | |
|---|---|---|
| 7/28/22 | Mark's initial appearance, refusing counsel and requiring *Faretta* hearing (DE:75) | **Clock Begins With Last Co-Defendant Appearance** |
| 8/4/22 | Mark's *Faretta* hearing (DE:293) | |
| 8/8/22 | Sua sponte order for competency hearings to be held by 8/31/22 and extending exclusion of speed trial days (DE:85) | |
| 8/11/22 | Government motion to continue trial on grounds that "BOP officials stated" they could not complete competency evaluations "prior to September 23, 2022" (DE:88:1-2) | |
| 8/11/22 | Order continuing trial until 1/3/23, and extending "interests of justice" exclusion of days up to new trial calendar (DE:89) | **District Court's Ends-of-Justice Exclusion Through 1/3/23** |
| 8/18/22 | Jonathan (DE:91) and Jordan (DE:92) request appointed counsel | |
| 8/26/22 | Jonathan (DE:105) and Jordan (DE:111) move to dismiss, arguing that court-ordered competency evaluations "depriv[ed them of their] rights to a speedy trial" | |
| 9/19/22 | Order denying Jordan's motion as improperly filed pro se after counsel appointed (DE:116) and denying Jonathan's motion because "zero non-excludable Speedy Trial days elaps[ed]" (DE:117) | |
| 9/22/22 | Jonathan requests 60-to-90 days to obtain counsel, warned that this would extend trial date (DE:278:4-5, 8-10) | |
| 10/18/22 | Results of Jonathan's competency evaluation filed (DE:126) | |

| 11/2/22 | Results of Jordan's competency evaluation filed (DE:135) | **District Court's Ends-of-Justice Exclusion Through 7/3/23** |
|---|---|---|
| 11/4/22 | Jonathan and Jordan request another 60-to-90 days to find counsel, and the court continues the trial to 7/3/23 calendar citing Appellants' own delays (DE:264:5, 10-11, 15; DE:139). | |
| 1/2/23 | Jordan's appointed lawyer moves to withdraw, citing Jordan's renewed self-representation request (DE:144) | |
| 1/9/23 | Courts holds another Jordan *Faretta* hearing and grants his self-representation request (DE:319:5-10) | |
| 1/30/23 | Appellants found to be competent (DE:286:8-9), Mark and Joseph refuse counsel (DE:286:8-10) | |
| 6/1/23 | Mark refuses to answer if he'll accept counsel (DE:288:6) | |
| 6/27/23 | Mark refuses counsel (DE:292:4-5) | |
| 7/14/23 | Court holds another *Faretta* hearing for all Grenons but they refuse to answer (DE:294:8-10). | |
| 7/17/23 | Trial begins | |

Appellants' challenge to the ten-month period awaiting Mark's and Joseph's extradition[12] fails because "defendants who are indicted together are usually tried

---

[12] The Chief Judge's Covid-order expired 9/21/2021. Mark made his first appearance on 7/28/2022 (DE:75).

together," especially where the defendants are charged with a common conspiracy. *United States v. Lopez*, 649 F.3d 1222, 1234 (11th Cir. 2011). *Compare United States v. Tobin*, 840 F.2d 867, 869-870 (11th Cir. 1988) (eight-month-and-ten-day-delay "was reasonable" time to wait for unapprehended codefendant).

Joseph appeared in Miami on December 23, 2021 (DE:47). The government explained why it believed Mark's extradition would soon follow (DE:64:4-8), and the district court did not clearly err in determining the days necessary to extradite Mark were excludable (DE:56; DE:64:39).

Importantly, Appellants never asked for their cases to be severed from Mark's or Joseph's and immediately tried. *Compare United States v. Khoury*, 901 F.2d 948, 973 (11th Cir. 1990) (delay unreasonable where defendant moved to sever and government made no showing of efforts to pursue fugitive codefendant). They only ever asked to be immediately released, raising sovereign citizen arguments against the proceedings (DE:290:6-8). Absent a severance motion, the delay "is properly charged to the defendant." *United States v. Woodley*, 484 F. App'x 310, 317 (11th Cir. 2012) (applying *Khoury*).

Regardless, Appellants' point that multiple trials would not have been difficult, because trial lasted only two days, ignores that the court could not know in advance the Appellants would offer no defense requiring a more fulsome government presentation. Moreover, the difficulty of conducting multiple trials is

only one reason joint conspiracy trials are preferred. "[T]hey reduce the risk of inconsistent verdicts" in addition to the burdens of "serial trials." *Lopez*, 649 F.3d at 1233.

The risk of inconsistent verdicts and the inefficiencies of multiple trials was especially pronounced here, because of the Grenons' united strategy. At the beginning, they filed a joint motion to dismiss under all their names, even while Mark and Joseph were fighting extradition (DE:20). Mark continued to direct responses to the prosecution from Colombia (DE:64:37-38) and even filed a pleading (DE:65), identical to Jonathan's (DE:68) and Jordan's (DE:69), questioning the district court's jurisdiction months before he appeared in the United States (DE:75).

Once Mark arrived, Appellants caused extensive further delays themselves. Their behavior caused the court to order competency evaluations. And they repeatedly asked for more time to engage counsel before changing their minds and deciding again to represent themselves.

The district court made proper ends-of-justice findings each time it continued trial, and its determination that the time was excludable was not clearly erroneous. *See United States v. Register*, 182 F.3d 820, 828 n.8 (11th Cir. 1999) (rejecting Speedy Trial Act argument on, among other grounds, that the 38-month delay was

attributable to excludable time such as resolving motions, joinder with co-defendants, and ends-of-justice findings).

Properly granted continuances may allow such a two-year period without violating the Speedy Trial Act. *See United States v. McCutcheon*, 86 F.3d 187, 190 (11th Cir. 1996) ("Although two years elapsed between McCutcheon's arraignment and trial, his rights under the Speedy Trial Act, 18 U.S.C. § 3161, *et seq.*, were not violated.").

Similarly, the *Barker v. Wingo* factors show no reversible violation of Appellants' Constitutional speedy trial rights. *See Barker v. Wingo*, 407 U.S. 514, 530 (1972) (requiring consideration of (1) the length of the delay, (2) the reason for the delay, (3) whether and when the defendant asserted the right to a speedy trial, and (4) whether defendant has suffered actual prejudice as a result of the delay).

Appellants and their co-defendants were responsible for much of the delay by resisting extradition, their numerous nonsensical filings and other attempts to resist the proceedings, and their ever-changing position on whether they wanted appointed or engaged counsel or to represent themselves. *See United States v. Schlei*, 122 F.3d at 987 (recognizing delays caused by the defendants' numerous motions); *United States v. Murray*, 154 F. App'x 740, 745 n.8 (11th Cir. 2005) (rejecting both statutory and Constitutional speedy trial claims over delay caused by co-conspirators extradition).

38

The delays attributable to Covid do not weigh against the government. *See Ogiekpolor*, 122 F.4th at 1306. Likewise, "delays owing to the collaboration with Colombian authorities to coordinate the defendants' arrests and to extradite the defendants 'will not be held against the Government.'" *United States v. Jimenez*, 756 F. App'x 933, 938 (11th Cir. 2018) (citing *United States v. Hayes*, 40 F.3d 362, 366 (11th Cir. 1994)).

Because the *Barker* factors do not weigh heavily against the government, Appellants must show actual prejudice, which they cannot do. Displeasure with the length of the proceedings is not sufficient. *See Ogiekpolor*, 122 F.4th at 1308. Appellants point to no evidence that was lost or any witnesses they were unable to locate. Any information about their own conduct was in their own possession, but they chose to offer no defense.

The district court properly supported its continuances and Appellants have shown no reversible error. *See United States v. Dunn*, 83 F.4th 1305, 1316 (11th Cir. 2023).

## III.    Appellants Proffered No Prima Facie Religious Defense to their Charges.

The Grenons never raised a prima facie religious defense to their charges under the First Amendment or the Religious Freedom Restoration Act, so no RFRA analysis was necessary. Their admitted adoption of the "church" label to exempt their actions from legal scrutiny did not amount to a sincerely held religious belief

39

obliging them to market MMS. They espoused no belief that distributing MMS was part of any religious observance. They always claimed MMS was a medicine-based cure and then created a fictional church as a means of cloaking their marketing efforts with immunity. They only ever argued their believed immunity from all United States laws. But neither the First Amendment nor RFRA protected their right to sell an unapproved drug, much less to do so in defiance of court orders. Given the nature of the Grenons' assertions, the district court did not plainly err in forgoing any RFRA hearing and instructing the jury there was no religious defense to the charges.

"[T]o establish a prima facie RFRA claim, a defendant must first show … that he or she was exercising (or was seeking to exercise) his or her sincerely held religious belief …." *United States v. Grady*, 18 F.4th 1275, 1285 (11th Cir. 2021). A prima facie showing was made in *Grady* where the defendants "asserted that their actions at the Kings Bay naval base were 'in accordance with their deeply held religious beliefs that nuclear weapons are immoral and illegal.'" *Id.* at 1283. Even liberally construed, the Grenons made no such claim by questioning whether the government's "Corporate By-laws … even apply to God fearing sons" (DE:20:2). Simply asserting that "Our Religious freedoms have been violated" (*id.*) did not assert a religious right to market MMS.

40

The use of the word "church" is not a shibboleth. "[M]ere recitation" of the word does not create constitutional status. *Cf. Johnson v. Bd. of Regents of Univ. of Georgia*, 263 F.3d 1234, 1256 (11th Cir. 2001) (quoting *Frontiero v. Richardson*, 411 U.S. 677, 690 (1973)). The conspirators' own statements and marketing materials belied any religious exercise in their charged conduct.

In its pretrial motion (DE:155), the government relied on statements posted on Genesis's website and its own promotional materials. Appellants were part of the conspiracy and active members of Genesis's marketing. They can hardly distance themselves from these statements in furtherance of the conspiracy. *See United States v. Browning*, 723 F.2d 1544, 1549 (11th Cir. 1984) (including co-conspirator statements among evidence showing a conspiracy's purpose).

Mark, the leader of the charged conspiracy, explained: "You can't arrest us from doing one of our sacraments, and I knew this. So that's why . . . I said let's do a church" (DE:155:11, quoting The Controversial Healing Cure ~ CORONAVIRUS, CLIMATE & 5G ~ featuring MARK GRENON, Age of Truth TV (March 7, 2020), https://ageoftruth.tv/the-controversial-healing-cure-coronavirus-climate-5g-mark-grenon/). When the interviewer asked, "so it wasn't really about religion? It was in order to, in a way, legalize the use of MMS?", Mark replied, "Right. It wasn't at all religious" (*id.*). Mark added that "[e]verybody hated

41

the idea" of a church, but he said, "you've got to do this, folks, or you're going to go to jail" (*id.*).

The government also relied on posted statements by the indictment's listed co-conspirator 1 (Humble) (DE:16:6) that what they were doing was "not religion" (DE:155:12). "If handled properly a church can protect us … from many things that a government might want to use to oppress us …." (*id.*).

"To qualify for RFRA's protection, an asserted [religious] belief must be sincere," not "pretextual." *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 717 n.28 (2014). *See United States v. Quaintance*, 608 F.3d 717, 724 (10th Cir. 2010) (rejecting RFRA defense to drug charges lacking "the essential element of sincerity"). *Quaintance* emphasized how the defendants suggested a co-defendant join their "church" because "it would legalize his marijuana use." *Id.* at 722.

Trial evidence corroborated Mark's ruse to "start a mission, a church, because the word 'church' just means, in the Greek, a group of people with one purpose" (DE:298:109; GX15). He admitted they could "have atheists in our church" because their purpose was to do things "commercially … separate from … codes, statutes, and laws … and not get arrested" (*id.*).

At no point in this case or in any of their materials did the Grenons assert a religious basis for the use or distribution of MMS. This was not a church with a religious practice of ingesting a controlled substance for ritual or spiritual reasons.

*Compare Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 439 (2006) (recognizing exemptions for "sacramental use" of controlled substances). Nor is this a case where the government attempted to preference secular or only more-widely-recognized religious bases for seeking exemptions from drug approval regulations. *Compare Does 1-11 v. Bd. of Regents of Univ. of Colorado*, 100 F.4th 1251, 1269 (10th Cir. 2024) (striking a vaccine policy "granting exemptions for some religions, but not others"). The Grenons made no religious claims about MMS at all.

Genesis's own materials cited a medical basis for MMS's efficacy. The reason they wished to distribute it was to medicinally cure diseases, not spiritually cure them. Genesis's website linked to Humble's description of "discover[ing] that chlorine dioxide quickly eradicates malaria" "while on a gold mining expedition in South America" (DE:298:103-105; GX12). They claimed it worked because "MMS is an oxidizer, it kills pathogens and destroys poisons" (GX12).

There was nothing spiritual or religious about MMS's purported healing properties. They simply called the products available for purchase on their website "sacraments" as part of their admitted legal strategy to avoid United States laws. The shopping page of their website described Genesis II as "a free church under common law and … not under commercial law" (GX17). Genesis's newsletter told people not to quit their own churches: "Come to us for healing and sanctuary from vaccinations

43

and other government interference, and go to your church for your spiritual beliefs" (GX14:3).

The only religious freedom they claimed was the freedom not to be subject to United Sates law. Their argument for dismissal was that their "Religious freedoms have been violated … do to Policies of the FDA unlawfully issued by someone an employee … (*Not* Appointed or *Not* elected)" (DE:20:2). They challenged the authority of the FDA and the United States government itself: "[W]e are unaware that Corporate By-laws do even apply to God fearing sons, (Mankind) not residing in a Foreign Federal District inhabiting our body's on Florida and Columbia serving Christ YAHWE our Savior" (*id.*; *see also* DE:290:6-8).

But sovereign citizen and like ideologies do not create religious exemptions from American law. *See Bey v. State*, 847 F.3d 559, 561 (7th Cir. 2017) (proclaimed "Aboriginal Indigenous Moorish-American" "has no immunity from U.S. law"). "Regardless of an individual's claimed status of descent, be it as a 'sovereign citizen,' a 'secured-party creditor,' or a 'flesh-and-blood human being,' that person is not beyond the jurisdiction of the courts. These theories should be rejected summarily, however they are presented." *United States v. Benabe*, 654 F.3d 753, 767 (7th Cir. 2011); *cf. United States v. Brown*, 669 F.3d 10, 19-20 (1st Cir. 2012) (defendant's belief about the validity of U.S. tax laws was not relevant to his mens rea in resisting a marshal).

In a non-precedential decision, a panel of this Court affirmed a defendant's sentence for his supervised release violation despite his claim that "cooperat[ing] with the probation officer … was against his sincerely held religious beliefs." *United States v. Focia*, 856 F. App'x 830, 832 (11th Cir. 2021). "[S]upervised release limited Focia's freedom and privacy, but that alone does not make it unlawful, despite what he may believe." *Id.* at 834.

The district court correctly instructed the jury there was no religious defense to these charges, because the Grenons did not proffer a prima facie claim that they had religious beliefs requiring them to market drugs without FDA approval or mislabeled to falsely describe their effects. *See United States v. Murry*, 31 F.4th 1274, 1293 (10th Cir. 2022). Just as RFRA's protection of the right to conduct marriages does not help a defendant who cannot argue "that his faith requires pastors to use marriage to evade immigration laws," it could not help the Grenons argue their faith required them to evade the FDA by marketing unapproved and mislabeled drugs. *See id.*

The court thus properly instructed: "A person has a right to believe any religion or no religion and express any point of view, but the First Amendment does not protect the kind of criminal activity that is charged in this case. The First Amendment is not a defense to the crimes charged in the Indictment" (DE:298:78; *see also* DE:299:62). Appellants raised no objections.

45

Even if Appellants had proffered a prima facie RFRA claim, any error in not holding a hearing, to determine if the government's interests outweighed their religious rights, was not plainly erroneous, given the evidence showing they were not acting on religious obligations to market MMS or defy court injunctions. Appellants offered no defense at trial. They cannot show impairment to a defense they never presented.

## IV.    The District Court Did Not Plainly Err in Applying the Statutory Definitions of "Drug" and "New Drug."

Appellants' new argument on appeal challenging the court's definition of "drug" and "new drug" cannot survive plain error review, and any error was invited by their acceptance of the court's jury instructions. Moreover, no one argued and nothing suggests the court was bound by FDA's definition of "intended use."

Appellants never challenged either the expert testimony about how the statutory definitions applied or the court's instructions. Nor did they offer any contrary instructions. There was never any dispute at trial about MMS's intended use, because the unchallenged evidence of the Grenons' own website and promotional materials was that MMS was intended for use as a cure for cancer and other diseases.

"Drug" and "new drug" are defined in 21 U.S.C. § 321(g)(1) and (p)(1). A "drug" includes "articles intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in man" or "intended to affect the structure or

any function of the body of man." § 321(g)(1)(B) and (C). A "new drug" includes one "not generally recognized, among experts qualified by scientific training and experience to evaluate the safety and effectiveness of drugs, as safe and effective for use under the conditions prescribed, recommended, or suggested in the labeling thereof." § 321(p)(1). There was never any dispute MMS satisfied these statutory definitions.

The government gave notice prior to trial (DE:166) (to which Appellants never objected) and then offered at trial the expert testimony of Dr. Arthur Simone, a Senior Medical Advisor in the FDA's Office of Unapproved Drugs, who was accepted by the court—without objection—"as an expert in the application of the [Food, Drug, and Cosmetic Act] as it relates to the distrubution [sic] of potential new drugs and the misbranding of drugs" (DE:299:5-6, 11). Dr. Simone discussed the statutory definitions of a drug and a new drug (DE:299:15), again without objection. His explanation for how one could determine a product's intended use was consistent with 21 C.F.R. § 201.128,[13] though he did not reference the regulation. He looked at MMS's "label and labelling," that included not just "what's attached to the bottle"

---

[13] "[I]ntended uses … may be shown by [the responsible person's] expressions, the design or composition of the article, or by the circumstances surrounding the distribution of the article [such as] labeling claims, advertising matter, or oral or written statements by such persons or their representatives." 21 C.F.R. § 201.128.

but also "advertising" and anything "that describe[s] it," and cited the Grenons'

"multiple claims" that MMS cured diseases (DE:299:16-17).

Appellants never responded to the government's proposed instructions

consistent with this testimony (DE:174:13-14). Nor did they propose any

instructions of their own.

The court ultimately instructed the jury:

> An article is a "drug" if it is intended for use in the diagnosis, cure,
> mitigation, treatment or prevention of disease in humans, or if it is
> intended to affect the structure or any function of the human body.

(DE:299:54, *see* § 321(g)(1)). Its instructions on intended use were consistent with

Dr. Simone's unchallenged testimony.

> A product's intended use is what a reasonable person would conclude
> the manufacturer or seller intended based on all the relevant
> information. You can determine the intended use of a product by
> considering the label, accompanying labelling, promotional material,
> advertising, oral representations made about the product, the
> circumstances surrounding the distribution of the article and
> information from any other source which discloses intended use.

(DE:299:54). Appellants never asked the court to determine for itself MMS's

intended use.

Appellants concede the definition of a drug "include[s] 'articles intended for

use in the diagnosis, cure, mitigation, treatment, or prevention of disease in man or

other animals'" (Jonathan Br. at 45; Jordan Br. at 50, quoting § 321(g)(1)(B)). The

undisputed evidence of their own MMS marketing satisfied that definition.

Their own website promised "a world without disease" and described MMS as "the controversial healing cure" (DE:298:88-90; GX2). The posted promotional videos discussed protocols for curing cancer (DE:298:91-92; GX3), HIV/AIDS (DE:298:98; GX6), Covid (DE:298:98-101; GX7; GX8), and other diseases. And there was no dispute that MMS was never approved for these purposes (DE:299:29-30).

Nothing in the record reflects the court applied *Chevron* deference. The court exercised its judgment in instructing the jury, just as required. *See Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244 (2024) (overruling *Chevron U. S. A. Inc. v. NRDC, Inc.*, 467 U.S. 837 (1984), and holding "[c]ourts must exercise their independent judgment" and "may not defer to an agency interpretation[s]"). No deference was requested or applied.

Appellants never raised below their Article III argument on appeal that only Congress, and not the FDA, could define "drug" or "new drug." Their argument was that their "[r]eligious freedoms have been violated … [a]ll do to Policies of the FDA unlawfully issued by someone an employee Ms. Dix (*Not* Appointed or *Not* elected)" (DE:20:2). This was not an objection that would be cured if the court had not "deferred to the agency's definition[s]" (Jonathan Br. at 17).

Appellants' somewhat-contradictory arguments were that the entire "De Facto Government" was "foreign to *us* as State Nationals" and yet the problem with the

49

FDA's policies were that they were issued by someone "*Not* Appointed" (*id.*). The Commissioner of the FDA is appointed by the President and confirmed by the Senate. 21 U.S.C. § 393(d)(1).

Their new argument on appeal fails, if for no other reason, because there is no controlling authority extending *Loper Bright's* administrative law principles to how courts craft criminal jury instructions. *United States v. Vereen*, 920 F.3d 1300, 1312 (11th Cir. 2019) (no plain error in absence of controlling authority).

Regardless, there was no error, because the court's instructions were consistent with the plain meaning of the statute's text: "articles intended for use in the diagnosis, cure, mitigation, treatment, or prevention of disease in man" or "intended to affect the structure or any function of the body of man." § 321(g)(1)(B). The court properly instructed the jury on determining MMS's intended use with language giving effect to the statute's plain meaning. *See Loper Bright*, 144 S. Ct. at 2285 (Gorsuch, J., concurring) (the judicial function focuses "on the statutory text, its linguistic context, and various canons of construction").

To the extent there was any error, because of the undisputed evidence about MMS's use the instructions were not "so clearly erroneous as to result in a likelihood of a grave miscarriage of justice, or … seriously affect[] the fairness, integrity, or public reputation of judicial proceedings." *Graham*, 2024 WL 4929254, at *35. Moreover, Appellants invited any error by standing mute and failing to object to

50

either the government's or the court proffered instructions (DE:299:40-41), Dr. Simone's testimony, or the ultimate instructions given (DE:299:53-56). *United States v. Hill*, 119 F.4th 862, 866 (11th Cir. 2024).

## V. Appellants Cannot Challenge the Underlying Injunctions in an Appeal from their Criminal Contempt Convictions.

Appellants were convicted in Counts 2 and 3 for violating the orders in *United States v. Genesis II Church of Health and Healing, et al.*, Case No. 20-21601-CV-WILLIAMS, enjoining the Grenons from "directly or indirectly, label[ing], hold[ing], and/or distribut[ing] any [unapproved or misbranded] drug, including but not limited to MMS" (CV DE:4:3; CV DE:26:8; DE:16). They never appealed those orders.[14]

They may not violate them and then challenge their convictions for violating them by contesting their underlying validity. "[T]he validity of a criminal contempt adjudication resulting from the violation of a court order does not turn on the meritoriousness of that order." *ITT Cmty. Dev. Corp. v. Barton*, 569 F.2d 1351, 1356 (5th Cir. 1978).[15]

---

[14] Nor did they move to dismiss the indictment on the grounds asserted on appeal that they were entitled to a jury trial in the earlier proceedings (DE:20). They demanded a Seventh Amendment civil jury trial in *this* criminal case, as part of their continued denial of the applicability of United States criminal law (DE:288:7).

[15] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), this Court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to close of business on September 30, 1981.

Nevertheless, there was no error, plain or otherwise, and their attempts to undermine the validity of those temporary and permanent injunctions fail because "[t]here is no right to a jury trial [regarding] purely equitable relief such as an injunction." *CBS Broad., Inc. v. EchoStar Commc'ns Corp.*, 450 F.3d 505, 517 (11th Cir. 2006). *See Gallardo*, 977 F.3d at 1142 n.12 (unpreserved legal challenges to convictions reviewed for plain error). Their Count 2 and 3 convictions related solely to their violation of the injunctions, not any other portion of the underlying orders.

## VI.   Appellants' Guideline Sentences Were Properly Supported by Unchallenged Evidence and Were Substantively Reasonable.

Trial evidence and unobjected to PSI statements supported Appellants' responsibility for the conspiracy's substantial harms, including the number and type of victims and total amount involved in their offenses. Their unremorseful exploitation of thousands of seriously ill people justified their sentences. The district court also made a proper *Keene* finding[16] that it would have imposed the same low-end guideline sentence regardless of the enhancements challenged on appeal (DE:267:19; DE:270:11). Neither Appellant objected to the timeliness of the PSI's disclosure or asserted that the court failed to make any necessary sentencing

---

[16] *See United States v. Keene*, 470 F.3d 1347 (11th Cir. 2006) (no reversible error if the record reflects the sentence would be the same despite erroneous sentencing determinations and the sentence is reasonable).

findings. Any errors were therefore harmless or fail plain error analysis where unpreserved.

Probation grouped Appellants' offenses and recommended a base offense level of 6, pursuant to USSG §§ 2B1.1 and 2X1.1, for their violation of 18 U.S.C. § 371 (Jonathan PSI ¶ 104-05; Jordan PSI ¶ 104-05). Probation recommended the same enhancements for each (Jonathan PSI pp. 26-27; Jordan PSI pp. 26-27):

- 16 points for a $1,594,566.25 loss amount -- § 2B1.1(c)(1)(I)

- 2 points for ten or more victims -- § 2B1.1(b)(2)(A)(i)

- 2 points for violating prior judicial orders -- § 2B1.1(b)(9)(C)

- 2 points for sophisticated means -- § 2B1.1(b)(10)(C)

- 2 points for offenses involving reckless risk of death or serious bodily injury -- § 2B1.1(b)(16)

- 2 points because they knew or should have known their victims were vulnerable victims -- § 3A1.1(b)(1)

- 2 points for the large number of victims -- § 3A1.1(b)(2)

Both received total offense levels of 34 and criminal history categories of I, resulting in advisory guideline imprisonment ranges of 151 to 188 months (Jonathan PSI ¶¶ 118, 121, 151; Jordan PSI ¶¶ 118, 121, 150). Neither filed written objections.

"[U]nobjected-to factual allegations in the PSR are admitted for sentencing purposes." *United States v. Thomas*, 32 F.4th 1073, 1077 (11th Cir. 2022).

Their appellate argument concerning proof of when they received their PSIs ignores their refusal to accept service of documents. *See* Fed. R. Crim. P. 32(e)(2) (requiring disclosure of PSI 35 days before sentencing). The PSIs were disclosed on August 25, 2023, forty-two days before their October 6, 2023 sentencing hearings (DE:203; DE:205: DE:267; DE:270). But the Grenons refused to accept any court documents—whether delivered to the prison by certified mail or handed to them in person at hearings—part of their refusal to recognize the proceedings (DE:200; DE:201; DE:267:8, 19, 22; DE:270:2, 7, 9; DE:288:8-10). The absence of proof of when they received the PSIs is therefore harmless. *See United States v. Willis*, 649 F.3d 1248, 1257 (11th Cir. 2011) (applying harmless error analysis to PSI disclosure requirements). In fact, because neither objected, claiming an untimely disclosure, they would have to show plain error, which their ability to offer their objections to the existence of any victims shows they cannot satisfy. *See United States v. McElrath*, 253 F. App'x 866, 870 (11th Cir. 2007) (no plain error shown where defendant was able to raise PSI objections).

Jonathan's objection to his sentencing calculation was that there was "no valid claim by a man or woman" (DE:267:7). "No victims were proven before a trial by jury. So that's why I don't consent to the guidelines" (DE:267:16). He did not object to particular sentencing findings in his PSI. He raised a "*Booker*" argument that "no

proof of a victim or monetary loss has been brought before a trial by jury" (DE:267:7, referencing *United States v. Booker*, 543 U.S. 220 (2005)).

Jordan acknowledged "I have seen the PSR and I object" (DE:270:6). Like Jonathan, he raised a "*Booker*" objection, arguing that "[t]he prosecution did not bring forth any victims with a valid claim or verifiable claim to the trial by jury" and therefore "using the guidelines in the PSR that there are many victims … not brought through in court is irrelevant" (DE:270:6-7). He maintained he had "not knowingly harmed any man or woman" and that the recommended sentence was "too harsh" (DE:270:8-9).

Their *Booker* arguments were misplaced, because the sentencing factors were used only to calculate their advisory guideline sentencing ranges. *See Booker*, 543 U.S. at 246 (no error where Guidelines applied in advisory fashion). Regardless, the trial evidence and unchallenged PSI assertions supported their guideline ranges.

At Jonathan's (DE:267) and Jordan's (DE:270) sentencing hearings, the government relied on the trial evidence of their "appalling" (DE:267:4) and "[h]einous conduct" (DE:270:4). The Grenons "preyed" on "people suffering from … serious diseases such as cancer, multiple sclerosis, HIV/AIDS, [and] on parents of autistic children" (DE:267:4), "some of the most vulnerable and desperate people in this country" (DE:270:4).

55

The district court accepted Probation's determinations and sentenced each Appellant to a total term of 151 months' imprisonment (60 months as to conspiracy count 1 to run consecutively to the 91-month terms for counts 2 and 3) (DE:267:16-17; DE:270:10-11). At Jonathan's hearing, the court explained it "could not agree more … with the government's characterization of your conduct and the seriousness of the offense conduct" (DE:267:17). At Jordan's immediately-following hearing, the court found him "similarly situated with Jonathan [and] agreed with the government with regard to all of the reasons explained as to why a guideline sentence here is necessary and not greater than required to achieve the objectives in sentencing" (DE:270:11).

Following pronouncement of sentence, Jonathan's only renewed objections were to the reasonableness of the sentence ("a bit harsh") and the purported failure "to prove that there were any victims" (DE:267:19-20). Jordan's only objection was that his sentence for the "the contempt charge is much higher and much harsher than" what others receive (DE:270:13). Neither objected to the timeliness of the PSI disclosure—either before or after pronouncement of sentence—or asserted that the district court failed to make necessary sentencing findings.

This Court need not address the guideline calculations, however, because of the district court's *Keene* finding at Jonathan's hearing that "my sentence would be the same regardless of the additional enhancements" even if "any of those are in

56

error" (DE:267:19). It then referenced that finding at Jordan's immediately-following hearing when it found Jordan "similarly situated" and that his sentence was reasonable for all the same reasons (DE:270:11). Their defiance of court orders, the vast number of victims, and their indifference to customers' life-threatening injuries justified their sentences even under their proposed, lower Guidelines range. *See United States v. Cenephat*, 115 F.4th 1359, 1370 (11th Cir. 2024) (affirming reasonable sentence under *Keene*).

Nevertheless, undisputed trial evidence established the Grenons received "tens of thousands" of MMS orders totaling "[o]ver 1 million" dollars (DE:298:1133-34). Neither Appellant objected to Probation's calculation that the total amount was $1,594,566.25 (Jonathan PSI ¶ 94; Jordan PSI ¶ 94).

Their solicitations targeted cancer patients and those suffering from various serious illnesses (DE:298:91-92, 98-101, 104-05; DE:299:16-17; GX3; GX6; GX12). Trial evidence showed their lack of concern for their customers' hospitalizations and other life-threatening reactions (DE:298:137-50; GX45; GX47; GX49; GX51). Victim statements described the trauma inflicted on autistic children (Jonathan PSI Addendum; Jordan PSI Addendum). Neither Appellant objected to these victim statements or to Probation's assertion that their offenses involved "over 800 victims who were a vulnerable population with incurable or otherwise serious diseases and disorders" (Jonathan PSI ¶ 100; Jordan PSI ¶ 100).

Appellants simply denied the legitimacy of the jury's verdict and the entire proceeding (DE:267:7; DE:270:2, 6). Their sentencing objection was that there were *no* victims, not that the government had failed to establish the number or type of victims or a correct dollar amount (DE:267:7 ("There is no valid claim by a man or woman."); DE:270:6 ("The prosecution did not bring forth any victims with a valid claim …..")). "A defendant waives objections to the PSR, however, if they are not specific and clear." *Thomas*, 32 F.4th at 1077.

Regarding their unpreserved challenge to attributing the total conspiracy amount to them, their roles in the conspiracy were established at trial, rendering the entire amount within their responsibility. Jonathan appeared in a promotional interview with Mark (DE:298:109; GX15); the products were shipped from Jonathan's home (DE:298:117, 130-31, 134; GX23; GX38); the contact card included with shipments contained both Jonathan's and Jordan's email addresses (DE:298:118-19, 132; GX27; GX43); Jordan responded to customer complaint emails (DE:298:128-29, 146-50, 151; GX35; GX37; GX52; GX49; GX51); Jordan posted a video of Jonathan promoting MMS after the injunctions (DE:298:167-70; GX59; GX60); and Jonathan bragged about distributing MMS in the weeks after the orders (DE:298:173; GX63). "A district court may hold participants in a conspiracy responsible for the losses resulting from the reasonably foreseeable acts of co-

58

conspirators in furtherance of the conspiracy." *United States v. Mateos*, 623 F.3d 1350, 1370 (11th Cir. 2010) (quotation omitted).

Jordan's disparity argument ignores that the terms of Mark's and Joseph's extradition limited the government to prosecuting them only for Count 1's conspiracy charge (DE:169; DE:170). They were thus sentenced to 18 U.S.C. § 371's statutory maximum term of 60 months (DE:218; DE:221). Jordan received the same sentence as Jonathan (DE:270:3-4), and those sentences were reasonable.

## Conclusion

For the foregoing reasons, Appellants' convictions and sentences should be affirmed.

Respectfully submitted,

Markenzy Lapointe
United States Attorney

By:    /s/ Jonathan D. Colan
       Jonathan D. Colan
       Senior Appellate Attorney
       99 N.E. 4th Street, #517
       Miami, FL 33132
       (305) 961-9383
       Jonathan.Colan@usdoj.gov

Daniel Matzkin
Chief, Appellate Division

Jason Wu
Deputy Chief, Appellate Division

Of Counsel

**Certificate of Compliance**

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 12,528 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements for Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2016, 14-point Times New Roman font.

## Certificate of Service

I hereby certify that four copies of the foregoing Brief for the United States were mailed to the Court of Appeals via Federal Express this 13th day of January 2025, and that, on the same day, the foregoing brief was filed using CM/ECF and served via CM/ECF on Assistant Federal Public Defender Bernardo Lopez (Counsel for Jonathan Grenon) and John W. Wylie, Esq. (Counsel for Jordan Grenon).

/s/ Jonathan D. Colan
Jonathan D. Colan
Senior Appellate Attorney

**ab**

62